IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WAYNE HAGAN,
     Plaintiff,

v.                                Civil Action No: 2:14cv32

ROBERT SCOTT,
JOHN COX,
SAMUEL RITCHIE,
LOGAN KINKADE,
BRAD TENNANT,
KAREN PSZCZOLKOWSKI, and
JIM RUBENSTEIN,
     Defendants.

## MEMORANDUM OPINION, ORDER AND REPORT AND RECOMMENDATION

### I
### BACKGROUND

May 1, 2014 Plaintiff, Wayne Hagan, a state prisoner acting *pro se*, filed a complaint under 42 U.S.C. § 1983 seeking compensatory damages, punitive damages, attorneys fees, costs of litigation alleging that Defendants Scott, Cox, Ritchie, Kinkade, and Tennant, as prison guards, hereinafter COs, improperly used excessive force during a cell extraction of Plaintiff while he was incarcerated at the Northern Correctional Jail. Plaintiff joined Defendants Pszczolkowski and Rubenstein in their capacities as Warden of NCJ and Commissioner of WVDOC respectively alleging they failed in their supervisory responsibilities for the overall operations to protect the Plaintiff by providing for the safe and secure daily operations of MOCC (Docket No.1-1).

Plaintiff's complaint makes the following fact allegations:[1]

1)     Plaintiff was an inmate assigned to cell C1-8 at Northern Correctional Facility on December 31, 2013 and January 1, 2014.

---

[1]The fact allegations are the undersigned's synopsis of Plaintiff's Complaint - Count I.

2)      Plaintiff flooded his cell December 31, 2013 and January 1, 2014.

3)      Defendants Cox and Richie told Plaintiff to pack up his stuff or they would come in and get it; that Hagan was being placed on D&D status; and, they shouted and cursed at Hagan for asking why he wasn't placed on D&D status for flooding his cell the day before.

4)      An hour later on January 1, 2014 Scott and Ritchie came to the cell door and told Plaintiff to give them his stuff.  Plaintiff refused.   Plaintiff claims Scott and Ritchie said if they had to suit up and come in and get his stuff then "he could count on getting his ass whipped: and then said "alright f#ck it" and "we been wanting to kick your ass anyways, were (sic) tired of your shit."

5)       An hour later Tennant came to the cell and told Plaintiff they were "all fed up with his shit and this was his last chance to give them his property or suffer the consequences."

6)      A female officer came in the pod, set up a video recorder, and left.

7)      Fifteen (15) minutes later Cox, Ritchie, Scott, Kinkade and Tennant come to Plaintiff's cell door suited up[2] and Tennant asked Plaintiff if he was going to cuff up[3].

8)      Plaintiff twice told them he was going to cuff up.

9)      Tennant ordered the cell door opened and the officers stormed inside the cell, tackled Plaintiff and began beating and attacking him.

10)     Plaintiff claims Scott punched him in the face and side of his head with a closed fist and that Cox kicked him on the right side of his body and several times to the side of his face and head area busting his forehead open just above his eye.

---

[2]Suited up is a slang term meaning officers donned protective riot type police gear.

[3]Cuff up is a slang term meaning that a prisoner voluntarily submits to being placed in hand cuffs.

11) After handcuffing Plaintiff, Plaintiff claims they pushed him out of the cell and slammed the left side of his face into the hall way door frame busting open the left side of his face and then slammed him in to the restraint chair.

12) Plaintiff claims to have suffered a large gash just below his right eye, In addition, he asserts that the nurse put butterfly stitches on his right elbow. Plaintiff claims he asked a nurse to photograph his injuries but the nurse did not.

13) Plaintiff further alleges he suffered blackouts, dizziness, and experienced sight problems in his right eye starting that night.

14) On request Plaintiff was taken to medical where he was told he had suffered a concussion. His face was swollen and he was told he may have damage to his ear drum.

In addition to the above claims against Scott, Ritchie, Tenant, Cox, and Kinkade, Plaintiff claims supervisory liability against Pszczolkowski and Rubenstein. Plaintiff claims on "information and belief" that Pszczolkowski and Rubenstein:

1) "(K)new or should have know of the pervasive and widespread abuse of inmates of NCJ";

2) "(F)ailed to properly investigate, train, supervise, ad [sic] discipline"

3) That such failure was deliberately indifferent", willful, or was a "tacit authorization of unconstitutional use of force against inmates."

After receiving Notice of Deficient Pleading (Docket No. 6), Plaintiff filed his complaint on the court's approved form on May 13, 2015 (Docket No. 8).

By Order dated September 22, 2014 the Clerk was directed to issue twenty-one (21) day summons for each Defendant and the United States Marshal was directed to serve the same on the Defendants within sixty (60) days of the order (Docket No. 23).

Defendants Cox, Kinkade, Ritchie, Tennant and Scott filed their answer to Plaintiff's

complaint on November 28, 2014 (Docket No. 34). The answer is a general denial and asserts a number of specific affirmative defenses.

On November 28, 2014 Defendants Pszczolkowski and Rubenstein filed their 12(b)(6) Motion to Dismiss Plaintiff's complaint (Docket No. 35).

Defendants filed their Motion For Summary Judgment on February 5, 2015 (Docket No. 58).

After being granted an extension of time to file his response to Defendant's Motion For Summary Judgment (Docket No. 68), the Court held a status conference on April 16, 2015 resulting in an Order dated the same date (Docket No. 72) directing the Defendants to provide Plaintiff with certain limited discovery to enable Plaintiff to file his response to Defendants' Motion For Summary Judgment by May 31, 2015.

Plaintiff filed a Motion To Compel Discovery on May 12, 2015 (Docket No. 75) and a modified and/or revised motion to compel discovery on May 20, 2015 (Docket No. 81)[4].

On May 29, 2015 Plaintiff filed his response to Defendants' Motion For Summary Judgment (Docket No. 82).

During the course of the litigation Plaintiff has requested and been denied appointment of counsel four (4) times:

| | | | |
|---|---|---|---|
| June 18, 2014 | Docket No. 12 | Denied June 19, 2014 | Docket No. 13 |
| September 8, 2014 | Docket No. 17 | Denied September 9, 2014 | Docket No. 18 |
| December 12, 2014 | Docket No. 42 | Denied December 15, 2014 | Docket No. 44 |

---

[4]During the pendency of the litigation, Plaintiff has sought to engage in discovery four (4) times: Docket No. 38 dated December 4, 2014 which motion for discovery was denied by order dated December 15, 2014; Docket No 50 dated January 8, 2015 which motion to amend or correct order denying motion for discovery was denied by order dated January 20, 2015 (Docket no. 52; Docket No. 55 dated January 26, 2015 which motion to engage in discovery was denied by order dated January 27, 2015 (Docket No. 56); and February 13, 2015 letter motion for discovery (Docket No. 61) denied by order dated March 2, 2015 (Docket No. 63).

April 16, 2015          Oral                    Pending

## II
## Issues

The within matter is now pending before the undersigned for consideration of the following four (4) matters:

A.     Defendants' (Pszczolkowski and Rubenstein) Motion To Dismiss (Docket No. 35).

B.     Defendants' (Scott, Cox, Ritchie, Kinkade, and Tennant) Motion For Summary Judgment (Docket No. 58).

C.     Plaintiff's Motion to Compel (Docket No. 77).

D.     Plaintiff's Motion For Appointment Of Counsel (Orally made during April 16, 2014 hearing).

## III
## Discussion

### A.     Motion To Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1999)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff.  Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the

... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," (Id) (citations omitted), to one that is "plausible on its face," Id. at 570, rather than merely "conceivable," Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

Defendants Pszczolkowski and Rubenstein contend Plaintiff makes no specific allegations against them. They further argue that Plaintiff alleges they, in their role as supervisors, caused or permitted subordinate officers to use force against inmates for improper reasons. (Docket No. 1, Count II, Paragraph 33-41.)

There is no *respondeat superior* liability under § 1983. <u>See</u> <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691-92 (1978); <u>Vinnedge v. Gibbs</u>, 550 F.2d 926, 928 (4th Cir. 1997). Instead, "liability will lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." <u>Vinnedge</u>, 550 F.2d at 928. A supervisor may be liable under § 1983 if the following elements are established:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1999).

The sum total of Plaintiff's supervisory allegations against Rubenstein and Pszczolkowski are:

> 1) (Defendants Rubenstein and Pszczolkowski) were at all times relevant supervisors of Defendant R. Scott, S. Ritchie, B.Tennant, J. Cox, and L. Kinkade, and other correctional officers at NCJ. (Docket No. 1, Count II, Paragraph 34.)
> 2) Upon information and belief, Plaintiff states Defendant and other CO's, prior to January 1, 2014, several times used or permitted other correctional officers to use force against inmates, not for the purpose of restraint or discipline, but for the malicious and sadistic purpose to punish. (Docket No. 1, Count II, Paragraph 35.)
> 3) Defendants Karen Pszczolkowski and Rubenstein's conduct was pervasive and constituted and unreasonable risk of constitutional injury to inmates like the Plaintiff. (Docket No. 1, Count II, Paragraph 36.)
> 4) Defendants Karen Pszczolkowski and Rubenstein knew or should have known of the pervasive and widespread abuse of inmates at NCJ, and the conduct of the named Defendants and other Correctional Officers. Nevertheless, these Defendants failed to properly investigate, train, supervise ad [sic] discipline the *named* defendants and other Co's at NCJ, to prevent injuries such as those sustained by Plaintiff. (Docket No. 1, Count II, Paragraph 37.)
> 5) Defendants Karen Pszczolkowski and Rubenstein's failure to properly investigate, train, supervise and discipline the named Defendants and other COs amounts to deliberate indifference or tacit authorization of unconstitutional use of force against inmates. (Docket No. 1, Count II, Paragraph 38.)
> 6) Defendants Karen Pszczolkowski and Rubenstein's deliberate indifference posed a substantial risk of harm to inmates like Plaintiff and proximately caused the injuries

of which Plaintiff complains. (Docket No. 1, Count II, Paragraph 39.)

7) The conduct of Defendants Karen Pszczolkowski and Rubenstein was objectively unreasonable and an unwarranted violation of Plaintiff's clearly establish [sic] constitutional rights pursuant to the Eighth and Fourteenth Amendments to the United States Constitution which a reasonable persons [sic] in the Defendants' positions should have known. (Docket No. 1, Count II, Paragraph 40.)

8) The conduct of Karen Pszczolkowski and Rubenstein as [sic] willful, wanton, intentional, and malicious and done with callous, reckless and deliberate indifference to Plaintiff's safety. (Docket No. 1, Count II, Paragraph 41.)

Plaintiff's allegations fall far short of meeting the three prongs of Shaw. Id. With respect to the first prong, Plaintiff alleges a conclusion that Defendants Pszczolkowski and Rubenstein had prior actual or constructive knowledge of the conduct of their corrections officers but alleges no facts to support that conclusion. No specific facts associated with specific inmates and specific corrections officers prior to January 1, 2014 are alleged. Nor does Plaintiff allege any facts showing that either of the defendants knew or were told of the specific events between Plaintiff and the five (5) corrections officers on January 1, 2014. Plaintiff fails to allege any facts from which the Court could plausibly infer that Pszczolkowski or Rubenstein were present at Plaintiff's cell during the December 31, 2013 incidents or the January 1, 2014 cell extraction; were aware that the COs were going to forcibly extract Plaintiff from his cell; and gave the COs approval for the specific acts of forcible extraction. There is evidence that after the extraction, Pszczolkowski authorized the use of the chair.

Moreover, even if Plaintiff had alleged facts sufficient to meet the first Shaw prong, Plaintiff fails to allege any facts showing what if any response or lack of response the Defendants or either one of them had which evidences "deliberate indifference or tacit authorization of the alleged offensive practices." Id. In short, Plaintiff fails to allege any facts which show cognizant and culpable inaction by either Rubenstein or Pszczolkowski. There is no allegation of fact that shows actual subjective consciousness of the risk of harm by either Rubenstein or Pszczolkowski. Farmer v. Brennan, 511 U.S. 825, 847 (1994).

Next, Plaintiff alleges no facts that would support any "'affirmative causal link' between the supervisors' inaction and the particular Constitutional injuries suffered by the Plaintiff." Shaw, *supra.*

There is no allegation affirmatively showing that either Pszczolkowski or Rubenstein "acted personally in the deprivation of Plaintiff's rights." Vinnedge, *supra* at 928.

It must be noted that the record of the status conference hearing held on April 16, 2015 is replete with admonitions to Defendant that his pleadings of supervisory liability were inadequate and that if he hoped to move forward on those claims he would have to amend his complaint before May 31, 2015. Plaintiff did not amend.

The undersigned is mindful that a complaint need not assert "detailed factual allegations." Twombly, *supra* at 555. However, it must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Id. (citations omitted). Plaintiff Hagan's "[f]actual allegations must be enough to raise a right to relief above the speculative level," (Id.) (citations omitted), to one that is "plausible on its face," Id. at 570, rather than merely "conceivable," Id.

The undersigned concludes on review of Plaintiff Hagan's Pleadings in Count II that the allegations therein, even augmented by the allegations in Count I, are nothing but labels, conclusions, and formulaic recitations of his cause of action and that Count II of the Complaint fails to state a claim of supervisory liability on which relief can be granted relative to Rubenstein and Pszczolkowski. Therefore, the undersigned **RECOMMENDS** that Rubenstein and Pszczolkowski be **DISMISSED** and that Count II of Plaintiff's complaint be **DISMISSED.**

**B**.     **Motion For Summary Judgment**

A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  Motions for summary judgment impose a difficult standard on the moving party because it must be obvious that no rational trier of fact could find for the nonmoving party.  Miller v. Fed. Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990).  In applying the standard for summary judgment, a court must review all evidence "in the light most favorable to the nonmoving party."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  Celotex, 477 U.S. at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  Id.  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 256.  The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment.  Id. at 248.  To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).  Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation.  Anderson, 477 U.S. at 248.  Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact

to find for the nonmoving party." <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

All Defendants joined in the pending motion for summary judgment (Docket No. 58). In the memorandum in support (Docket No. 59), Defendants make the following arguments:

1)    Plaintiff Hagan's prior conduct provided some justification for their belief that he was "a violent inmate that is not beyond violating prison rules and refusing orders" and justified their January 1, 2014 actions to forcibly extract him from his cell on January 1, 2014. For example:

    a.    September 4, 2013 Inmate Hagan was written up for causing a disturbance at St. Mary's Correctional Center (Docket No 59, Exhibit G).

    b.    September 17, 2013 Inmate Hagan engaged in a fight with another inmate (Docket No. 59, Exhibit F).

    c.    October 13, 2013 Inmate Hagan struck his cell door with sufficient force to possibly break a knuckle on his right hand (Docket No. 59, Exhibit E).

    d.    October 31, 2013 Inmate Hagan acted out verbally on the recreation yard by shouting obscenities at an officer and suggested that the officer engage in a sexual act with Inmate Hagan (Docket No. 59, Exhibit D).

    e.    November 21, 2013 Inmate Hagan assaulted another inmate (Docket No. 59, Exhibit C).

    f.    December 4, 2013 Inmate Hagan began throwing paper and other items out of the food tray slot on his cell door, kicking his door, screaming, and vowing he would continue to act out until he was transferred to another facility (Docket No. 59, Exhibit B).

2)    Plaintiff Hagan's conduct on January 1, 2014 justified their belief that he was "a violent

inmate that is not beyond violating prison rules and refusing orders" and therefore their actions to forcibly extract him from his cell were justified. For example:

a.  December 31, 2013 Inmate Hagan flooded his cell (Docket No. 59 Exhibit A).

b.  6:30 a.m. CO Cox was handing out milk. Inmate Hagan asked why he was being placed on D&D status (Docket No. 59 Exhibit A).

c.  Inmate Hagan was informed he was being placed on D&D status because of his flooding his cell (Docket No. 59 Exhibit A).

d.  Inmate Hagan knocked the milk out of CO Cox's hand (Docket No. 59 Exhibit A).

e.  Cox reported the incident to Sgt. Russell Powell (Docket No. 59 Exhibit A).

f.  Powell instructed Cox to close Inmate Hagan's food tray slot (Docket No. 59 Exhibit A).

g.  6:45 a.m. Inmate Hagan began punching and kicking his cell door (Docket No. 59 Exhibit A).

h.  6:50 a.m. Inmate Hagan began flooding his cell and yelling at the officers: "all officers are whores" and shouting other obscenities (Docket No. 59 Exhibit A).

i.  The water supply was cut off from Inmate Hagan's cell (Docket No. 59 Exhibit A).

j.  7:30 a.m. the extraction team was assembled (Docket No. 59 Exhibit A).

k.  7:40 a.m. Inmate Hagan was asked if he would cuff up and he responded "fuck you" (Docket No. 59 Exhibit A).

l   Thereafter cell extraction of Inmate Hagan commenced (Docket No. 59 Exhibit A).

3)  Hagan's "claims must fail because the force used by the Defendant Officers in entering the Plaintiff's cell to take control of the Plaintiff was a good faith effort to restore order." (Docket No. 59, p. 5.) arguing:

a.      Inmate Hagan's long history of rules violations coupled with his conduct for a period of 24 hours leading up to the cell extraction caused the officers to have a good faith belief there was "the need for application of force" in order to restore discipline. Whitley v. Albers, 472 U.S. 312, 320-321 (1986).

b.      The extraction team faced with Inmate Hagan's history of prior conduct and conduct surrounding the extraction has to use force necessary to overwhelm and control Hagan. Id.

c.      Hagan did not suffer any significant injury. Instead, two of the CO's received treatable injuries. Id.

d.      The corrections officers reasonably perceived the threat posed by Hagan and that perception was borne out by his conduct which resulted in the injury of two of the officers. Id.

e.      Corrections Officers gave Inmate Hagan the opportunity to cuff up to "temper the severity of a forceful response" and he refused. Id.

4)      "The Plaintiff has failed to offer any evidence that Commissioner Rubenstein and/or Warden Ballard[5] were deliberately indifferent to a substantial risk or serious harm to the Plaintiff.

Plaintiff Hagan in his response argues:

1)      Defendant COs had no reason to use force some forty-five (45) minutes or so after the alleged milk and flooding of the cell incidents (Docket No. 82, p. 6).

2)      He (Hagan) did not knock any milk out of the hands of CO Cox's hand or hands (Docket No. 82, p. 6).

---

[5]While counsel writes Warden Ballard in the argument heading, the undersigned notes that the actual Defendant is Warden Pszczolkowski.

3) He (Hagan) admits flooding his cell but alleges the incident was over when the water was shut off to his cell  (Docket No. 82, p. 6).

4) He (Hagan) did not refuse to cuff up when asked if he would by the COs and instead asserts he told the COs at least twice that he would cuff up instead of getting beaten  (Docket No. 82, p. 6).

5) He (Hagan) admits he was upset about being placed on D&D status but he would rather give in since there was nothing he could do about it anyway. He claims he packed up his personal property and told the COs it was ready to be picked up, all to avoid getting cell extracted and placed in the restraint chair  (Docket No. 82, p. 6).

6) Hagan claims Defendant COs had already made up their minds to do a cell extraction because they came to his cell suited up and did not count on or accept that Hagan had changed his mind and stated he was willing to cuff up  (Docket No. 82, p. 6).

7) He (Hagan) denies injuring any of the COs and asserts an officer was injured when another officer stepped on his hand   (Docket No. 82, p. 8).

8) He (Hagan) received significant injuries, to wit: "open area and bruise's [sic] on face, skin, tear on right elbow and right hand swollen; applied sterile strips" (Docket No. 82, p. 8).

9) Defendant COs did not attempt to temper the severity of their forceful response (Docket No. 82, p. 10-11).

10) Defendant COs violated "Calulated [sic] use of force" Policy Directive 313.02 (Docket No. 82, p. 11-14).

11) Defendants had possession of video tape evidence of the cell extraction from two separate cameras that they since permitted to be overwritten thus destroying that evidence which would have shown the trier of fact what occurred at the cell before and during the cell

extraction, including Inmate Hagan's repeated offer to cuff up.

Viewing the facts as a whole, the undersigned finds there exist at least the following issues of fact that preclude summary judgment:

1) Did Inmate Hagan say he would cuff up thereby obviating the need for the COs to do a forcible cell extraction?

2) Did Inmate Hagan knock milk out of the hands of the CO?

3) Did the COs make any effort or efforts temper their use of force in accord with their own policies and the law?

4) Were Inmate Hagan's injuries sufficient to meet the third (3rd) prong of the test in Whitley?

5) Did the COs temper the force used to control the situation?

Plaintiff and Defendants rely on the five (5) factors set forth by the Supreme Court of the United States in Whitley v. Albers, 475 U.S. 312, 320-321 (1986). Whitley provides that in deciding whether force was applied as good-faith effort to maintain or restore discipline or was force used maliciously and sadistically to cause harm the Court must look to:

(1)  the need for application of force;
(2)  the relationship between the need and the amount of force that was used;
(3)  the extent of the injury;
(4)  the threat reasonably perceived by the responsible official; and
(5)  any efforts made to temper the severity of a forceful response.

The State of West Virginia Division of Corrections issued a policy directive on September 1, 2012, Policy 307.00 covering appropriate procedure and practice in the use of restraints. The policy provides in pertinent part that:

"It is the policy of the West Virginia Division of Corrections to maintain a mechanism that ensures the appropriate procedure and practice provide that instruments and restraints, such as handcuffs, irons, and straight jackets, are never applied as punishment and are applied only with the approval of the Warden/Administrator or designee. In addition, since four/five point restraints are

used only in extreme instances and only when other types of restraints have proven ineffective or the safety of the inmate is in jeopardy, appropriate written policy, procedure, and practice provide that when an inmate is placed in a Restraint Chair (4-Point Restraint (arms and legs secured)/5-Point Restraint (head, arms, and legs secured)/Stokes Basket, advanced approval is secured from the Warden/Administrator or designee before an inmate is placed in a four/five point restraint." (Docket No. 82, p. 18 - Ex 11.)

The policy signed by Commissioner Rubenstein also provides in pertinent part:

"A. Instruments of restraint shall be used only as a precaution against escape during transfer, for medical reasons, by direction of a medical officer, or to prevent self-injury, injury to others, or property damage. B. Restraints shall not be applied for more time than is absolutely necessary. D. Restraint Chair (4-Point Restraint)/4-Point/5-Point/Stokes Basket restraints shall be used only in extreme instances and only when other types of restraints have proven to be ineffective or the safety of the inmate is in jeopardy."

Whether there was a need (Prongs One, Two and Four of Whitley) for COs to suit up and do a cell extraction requiring them to forcibly enter Plaintiff's cell and forcibly take him down and cuff him in hand cuffs and leg restraints on January 2, 2014 is factually disputed. The COs present facts of Hagan's prior misconduct in violation of the rules and his immediate conduct of flooding his cell, knocking milk out of the hands of a CO, cursing the COs and spitting on a CO as evidence supporting their need to do so. To the contrary, Plaintiff Hagan consistently alleges in his complaint and argues in his response to the Motion For Summary Judgment that before they came to his cell, he the COs were coming suited up to do a forcible cell extraction, that they had told him he would "get his ass whipped". Plaintiff Hagan consistently maintains in his pleadings and response to the motion that, in order to avoid a beating, he gathered up his personal property and told the COs that they could come and get it and that he would cuff up. The undersigned may have been able to make a determination of what the truth was in the moments leading up to and during the cell extraction had the prison staff not permitted the hand held video evidence and the stationary prison camera video evidence to be overwritten and thus destroyed. (See affidavit of CO Powell, Docket No. 82, Ex 9).

The obvious purpose of making the video in the first place is to preserve picture evidence for use in claims such as the one herein pending. The benefit of that evidence to the trier of fact is now gone because of the actions or inactions of the prison staff. Of most significance is the loss of the voice content of the hand held video put on a tripod, positioned in front of the cell and turned on a short period of time before the cell extraction team arrived. It could prove or disprove Inmate Hagan's claim that he spoke in to the camera saying he would cuff up. It could prove or disprove that Inmate Hagan told the suited up COs that he would cuff up before the command to roll the door was given. While the Defendant COs imply their knowledge of Hagan's prior misconduct coupled with his alleged misconduct on December 31, 2013 and January 1, 2014 gave them reason to believe it was necessary to confront him with overwhelming force. To a trier of fact, the same knowledge on the part of the Defendant COs could be construed as giving the COs a preconceived reason to take Hagan down to teach him a lesson. Certainly the videos would have shed light on the matter by being able to hear who was saying what, when and how.

That same video would have also shed light on the issue of whether the COs tempered their use of force to that which was only necessary under the circumstances to gain control as opposed to inflicting punishment under Prong five (5) of <u>Whitley</u>. This issue is made more significant by the report of Capt. J.L. Greathouse to Warden Pszczolkowski dated January 14, 2014 (Docket No. 82, Exhibit 7). That report was prepared thirteen (13) days after the cell extraction and reflects that the tripod mounted video camera had already been written over. It also reflects that the C-1 monitor had not yet been written over. Based on Greathouse's review of the C-1 monitor, he reported to the Warden "It did not appear that any effort to temper had been exercised and it was a matter of needing to place the inmate under immediate control. I cannot say that I totally disagree with what was required, and due to their [sic] being injuries to staff and inmate I recommend that a further

investigation be conducted into this matter." Id. Absent the videos, the trier of fact is left with "he said" v. "he said." Moreover, there is the question of whether there was the need to use a restraint chair after the cell extraction and if so, for how long. Those issues raised by Plaintiff will again rely on what witnesses may say was Hagan's state of condition and mind at various points of the cell extraction and thereafter. Those facts are disputed. It can only be surmised what was told to the warden in order to get authorization for use of the chair. Certainly, there is no video evidence any longer available to give the trier of fact pictorial insight in to this issue.

With respect to Prong three (3) of Whitley, the extent of injuries, the undersigned notes that the medical records of the prison verify plaintiff's allegations that he suffered multiple surface lacerations on the face; he suffered a 2 cm laceration on right cheek bone that required sterile sutures to close; that he was complaining of pain and blurred vision in his right eye; that his face was bruised; that his right elbow was lacerated; that his right hand was swollen; and that x-rays were ordered. He alleges in his complaint that he was told he suffered a concussion and may have ear damage. In contrast, Defendants argue: "Plaintiff did not suffer any significant injury. In fact, two officers suffered injuries as a direct result of the Plaintiff that were more significant than any bumps or scrapes suffered by the Plaintiff while he resisted the Officers' efforts to place him in handcuffs and leg restraints." (Docket No. 59, p. 7.)

The undersigned cannot so easily dismiss Plaintiff's claims of injury. As noted in Ussery v. Sgt. Mansfild; James Dunlow; Timothy Ruffin, No 14-7096 (4th Cir. May 19, 2019) citing Wilkins v. Gaddy, 559 U.S. 34, 38-39 (2010): "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." This case arises out of facts that occurred long after the Supreme Court's decision in Wilkins abrogating Norman v. Taylor, 25 F.3d 1259 (4th Cir. 1994). No longer must an

inmate "seeking relief for excessive force ... establish either that he sustained more than de minimis injuries or that the defendants' use of force was 'of a sort repugnant to the conscience of manking and this expressly outside the de minimis force exception.'" <u>Ussery</u>, *supra.*

## C. Motion To Compel

The undersigned entered an order dated April 16, 2015 directing Defendants to provide specific information relative to the C-1 video and the tripod mounted video recordings in place and made at the time of the January 1, 2014 cell extraction. Plaintiff filed a revised motion to compel (Docket No. 81). A review of the responses made by Defendants reflects that Defendants failed to completely respond to the areas of inquiry as directed by the Court's Order. The undersigned does not know if that is because the Defendants' cannot specifically respond or simply failed to.

Since the responses may go to any future spoliation of evidence issue before the District Judge and will certainly go to the issues surrounding the loss through overwriting of the two videos, the undersigned hereby **GRANTS PLAINTIFF'S REVISED MOTION TO COMPEL (DOCKET No 81) and DIRECTS DEFENDANTS TO PROVIDE COMPLETE RESPONSES TO THE SPECIFIC INQUIRIES DIRECTED BY THE COURT'S ORDER DATED APRIL 16, 2015 WITHIN THIRTY (30) DAYS OF THE DATE OF THIS ORDER.**

It is so **ORDERED**.

## D. Appointment Of Counsel

The undersigned recommends that this case proceed as a normal civil action before the District Judge in accord with a scheduling order to be established by the District Judge.[6]

Notwithstanding that the undersigned repeatedly denied Plaintiff's prior requests for

---

[6]The parties were given the opportunity to consent to Magistrate Judge jurisdiction and did not (Docket No. 64 - 65).

appointment of counsel and Plaintiff, by the quality of his filings, has shown he has the ability to adequately represent himself in the preliminary matters before the Magistrate Judge, if the District Judge adopts this Report and Recommendation in whole or with respect to the denial of Defendants' Motion For Summary Judgment, it is the further **RECOMMENDATION OF THE UNDERSIGNED THAT PLAINTIFF'S ORAL MOTION FOR APPOINTMENT OF COUNSEL MADE AT THE APRIL 16, 2015 HEARING BE GRANTED AND THAT THE DISTRICT JUDGE APPOINT COUNSEL TO ASSIST PLAINTIFF IN THE PROCEEDINGS REMAINING BEFORE THE DISTRICT JUDGE.**

## IV
### Recommendation

For the reasons stated herein, the undersigned **RECOMMENDS** that Defendants' Pszczolkowski and Rubenstein Motion To Dismiss (Docket No. 35) be **GRANTED.**

For at least the reasons stated herein, the undersigned **RECOMMENDS** that Defendants' Motion For Summary Judgment (Docket No. 58) be **DENIED AS TO DEFENDANTS SCOTT, COX, RITCHIE, LOGAN, KINKADE AND TENNANT.**

The undersigned having already recommended Plaintiffs complaint be dismissed as to Defendants Pszczolkowski and Rubenstein, the undersigned further **RECOMMENDS** that the motion for summary judgment be **DENIED AS MOOT AS TO PSZCZOLKOWSKI AND RUBENSTEIN.**

Any party may, within fourteen (14) days after being served with a copy of this Memorandum Opinion, Order, Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation portion thereof to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the

Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation portions herein set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record and to mail a copy to the *pro se* Plaintiff by certified mail, return receipt requested.

DATED: June 8, 2015

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE